**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 10 2005**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ELLIOTT INDUSTRIES LIMITED
PARTNERSHIP, a New Mexico
limited partnership,

       Plaintiff-Counter-
       Defendant-Appellant,

v.

BP AMERICA PRODUCTION
COMPANY, a Delaware corporation,
and BP ENERGY COMPANY, a
Delaware corporation,

       Defendants-Appellees,

and

CONOCOPHILLIPS COMPANY[*], a
Delaware corporation,

       Defendant-Counter-
       Claimant-Appellee.

----------------------------------------

No. 04-2006

---

[*]Amoco Production Company has changed its name to "BP America
Production Company;" Amoco Energy Trading Corp. has changed its name to "BP
Energy Company;" and Conoco, Inc. has changed its name to "ConocoPhillips
Company," as stated in the Corporate Disclosure Statement for these parties.

LAURA DICHTER; ROMERO FAMILY LIMITED PARTNERSHIP, J. GLEN TURNER,

Intervenors.

----------------------------------------

ATTORNEY GENERAL FOR THE STATE OF NEW MEXICO,

Amicus Curiae.

ELLIOTT INDUSTRIES LIMITED PARTNERSHIP, a New Mexico limited partnership,

Plaintiff-Counter-Defendant-Appellee,

v.

BP AMERICA PRODUCTION COMPANY, a Delaware corporation, and BP ENERGY COMPANY, a Delaware corporation,

Defendant-Appellee,

and

CONOCOPHILLIPS COMPANY, a Delaware corporation,

Defendant-Counter-Claimant-Appellee.

No. 04-2014

----------------------------------------

LAURA DICHTER; ROMERO
FAMILY LIMITED PARTNERSHIP,
J. GLENN TURNER,

Intervenors-Appellants.

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CIV-00-655 LH/WDS)**

Kerry C. Kiernan, Eaves, Bardacke, Baugh, Kierst & Larson, P.A., Albuquerque, New Mexico (John M. Eaves, Paul Bardacke, Derek V. Larson, Eaves, Bardacke, Baugh, Kierst & Larson, P.A., Albuquerque, New Mexico; Mary E. Walta, White, Koch, Kelly & McCarthy, P.A., Santa Fe, New Mexico; William E. Snead, Law Offices of William E. Snead, P.C., Albuquerque, New Mexico, with him on the briefs), for Plaintiff-Counter-Defendant-Appellant and Plaintiff-Counter-Defendant-Appellee.

Scott S. Barker, Holland & Hart, LLP, Denver, Colorado (Marcy G. Glenn, Holland & Hart, LLP, Denver, Colorado; Arnold R. Thomas, Holland & Hart, LLP, Greenwood Village, Colorado, with him on the briefs), for Defendant-Appellees.

Michael B. Campbell, Michael H. Feldewert, Tanya M. Trujillo, Holland & Hart, LLP, Santa Fe New Mexico, on the briefs for Defendant-Counter-Claimant-Appellee.

Michael J. Condon (J. E. Gallegos, with him on the briefs), Gallegos Law Firm, P.C., Santa Fe, New Mexico, for Intervenors and Intervenors-Appellants.

Patricia A. Madrid, Attorney General, State of New Mexico, Santa Fe, New Mexico, filed an amicus curiae brief for the Attorney General for the State of New Mexico.

Before **SEYMOUR**, **McKAY**, and **MURPHY** Circuit Judges.

**MURPHY**, Circuit Judge.

## I.    INTRODUCTION

This case involves the payment of royalties on oil and gas leases.  Plaintiff-appellant Elliott Industries Limited Partnership, as an individual and as class representative, is appealing the district court's grant of summary judgment in favor of Defendants-appellees ConocoPhillips Company, BP America Production Company, and BP Energy Company.  A group of third-party litigants, Laura Dichter, Romero Family Limited Partnership, and J. Glenn Turner, appeal the denial of their motion to intervene and the district court's ruling in favor of defendants asserting that the district court lacked subject matter jurisdiction; they also seek to intervene on appeal.  The appeals and the motion to intervene are consolidated and addressed in this opinion.  In addition, the State of New Mexico has filed a brief as amicus curiae in support of plaintiffs' claims under New Mexico statutes.

This court exercises jurisdiction over these related appeals pursuant to 28 U.S.C. § 1291.  In Case No. 04-2006, this court **remands** the claims of the class to the district court with instructions to vacate the final judgment with respect to

the unnamed members of the plaintiff class, decertify the class, and dismiss the claims of the class without prejudice. As to Elliott Industries in its capacity as an individual plaintiff, the district court's judgment on the merits in favor of defendants is **affirmed**. The motion of the third-party litigants to intervene in the appeal of Case No. 04-2006 is **granted** and the appeal in Case No. 04-2014 is **dismissed**.

## II. BACKGROUND

### A. Facts

Elliott Industries Limited Partnership ("Elliott") is a New Mexico limited partnership with its principal place of business in Roswell, New Mexico. Elliott is the owner of royalty and/or overriding royalty interests in certain oil and gas units, leases, and wells owned or operated by ConocoPhillips Company and/or Amoco Production Company in the San Juan Basin. ConocoPhillips Company is a corporation organized and operated under the laws of Delaware with its principal places of business in Oklahoma and Texas. ConocoPhillips Company is the successor by merger to Conoco, Inc. [hereinafter "ConocoPhillips" unless otherwise specified]. Amoco Production Company and Amoco Energy Trading Corporation are corporations organized and operated under the laws of Delaware with their principal places of business in Illinois and Texas. The Amoco

defendants are the predecessors in interest to BP America Production Company and BP Energy Company [hereinafter "BP" unless otherwise specified].

The San Juan Basin, one of the largest natural gas producing fields located in northwest New Mexico and southwest Colorado, was originally developed in the early 1950's by El Paso Natural Gas Company ("El Paso"). The natural gas produced in the San Juan Basin is conventional gas which contains methane (natural gas) and entrained natural gas liquids ("NGLs"), such as ethane and butane. In order to make the gas safe to enter the interstate pipeline, the NGLs must be removed from the gas stream. ConocoPhillips and BP [hereinafter and collectively, "Appellees" unless otherwise specified] own and operate a natural gas processing plant called the San Juan New Blanco Gas Processing Plant (the "Plant"). The Plant is a state-of-the-art cryogenic facility that processes natural gas by extracting the NGLs from the natural gas stream. Appellees are each 50% owners of the Plant.

As a result of prior litigation between El Paso, Conoco, and Amoco's predecessor in interest, Tenneco Oil Company ("Tenneco"), those parties entered into a settlement agreement in 1984. Under the settlement, El Paso assigned leases to Conoco and Tenneco who jointly built the Plant straddling El Paso's pipeline. In return, Conoco and Tenneco obtained a guaranteed gas supply from El Paso, which together with their own gas, would fully supply the Plant for at

least twenty years.  As part of the settlement, El Paso and Tenneco entered into a Gas Plant Straddle and Processing Agreement whereby Conoco and Tenneco, as owners of the Plant, would retain 39% of all of the NGLs recovered from El Paso's gas as a fee for processing El Paso's gas.  Furthermore, Conoco and Tenneco entered into a Construction and Operating Agreement under which they agreed to retain, as compensation for operating the Plant, 39% of the NGLs removed from the natural gas stream, whether or not the gas originated from El Paso's pipeline.

Appellees are owners of working interests in numerous oil and gas leases and wells located within the San Juan Basin, New Mexico.  Appellees operate a number of the leases and wells in which they own working interests.  The working interests owned by Appellees in their oil and gas units, leases, and wells are burdened by royalty and overriding royalty interests owned by many parties, including members of the class and Elliott.  All of ConocoPhillips' contracts with Elliott and the class and nearly all of BP's contracts are governed by royalty instruments which require Appellees to remit royalty either on the "market value of the gas at the well" or "in the same manner as royalty is payable to the United States."[1]  Appellees provide an accounting on a monthly basis to the owners of

---

[1]The royalty calculation for this particular type of lease–the "same as fed" lease–is not relevant to the issues on appeal.

royalty and overriding royalty interests burdening their own working interests. To approximate the value of the gas at the wellhead, upon which the "at the well" royalty is based, Appellees deduct their post-production costs, including processing, marketing, transportation, and fractionation costs, from the value of the refined natural gas products. This method of calculation is often referred to as the net-back or work-back methodology.[2] Under this methodology, the "at the well" royalty paid to Elliott and the class members has been calculated based on the value of the refined natural gas products net of various post-production costs specifically including the 39% in-kind assessment retained by Appellees as compensation for processing the gas.

This litigation centers on the 39% of NGLs recovered from gas processed at the Plant that Appellees retain as a fee for processing the gas. Elliott claims this 39% in-kind fee is not a legitimate post-production cost and, by reducing the volume of NGLs and thereby Elliott's share of the gas stream, this hidden "charge" results in the underpayment of royalties owed to Elliott. Appellees argue that the royalties are based on the contracts creating each royalty interest

---

[2]Under the net-back or work-back methodology "value at the point of valuation is determined by taking the downstream sales price and deducting from it the costs incurred by the working interest owner [here Appellees] to move the gas from the point of valuation to the actual point of sale." Bruce M. Kramer, *Royalty Interest in the United States: Not Cut from the Same Cloth*, 29 Tulsa L.J. 449, 461 (1994).

and dispute Elliott's characterization of the 39% as a "charge," insisting the 39% adjustment is a legitimate post-production cost that is deductible for purposes of calculating the value of the gas at the wellhead.

In addition to the dispute over the 39% processing charge or deduction, the parties dispute whether there is an active market at the wellhead for conventional natural gas. Elliott also alleges that even assuming the processing fee is a legitimate post-production cost, the 39% fee charged here is unreasonable and exceeds the actual cost incurred for processing the gas.[3]

With regard to the royalties calculated in the "same manner as the federal government," until 1996 ConocoPhillips failed to pay those royalty owners in such a manner. Elliott alleges that ConocoPhillips has been unable to verify that after December 1996, it corrected all underpayments of "same as fed" royalty owners with interest back to 1991 and thereafter paid them correctly. In addition, BP sent a letter to the class in April 2002 admitting that it determined that the "same as fed" royalty owed to some overriding royalty owners had been

---

[3]Elliott further alleged below that BP charges an undisclosed ½ cent marketing fee related to the disposition of the NGLs and that BP deducts "transfer price" charges for fractionation and transportation service fees which are not disclosed to the class. We do not address the issues of the marketing fee and the "transfer price" deduction because Elliott makes no argument regarding these prior assertions on appeal.

improperly calculated yet it has not, according to Elliott, made any retroactive adjustments.

**B. Procedural History**

In May 2000, Elliott filed suit in federal district court alleging (1) violation of the New Mexico Unfair Trade Practices Act, N.M. Stat. Ann. § 57-12-1, *et seq.* (2004) (the "UPA"); (2) violation of the New Mexico Oil and Gas Proceeds Payment Act, N.M. Stat. Ann. § 70-10-1, *et seq.* (2004) (the "Payment Act"); (3) breach of an implied duty of good faith and fair dealing; (4) breach of an implied duty to market; (5) conversion; (6) constructive fraud; (7) fraud; (8) unjust enrichment; and (9) violation of the Sherman Act, 15 U.S.C. §§ 1, 2. ConocoPhillips filed a counterclaim, seeking a declaratory judgment that it had performed its contractual obligations under its leases. In its answer, BP asserted that the express provisions of the royalty instruments barred Elliott's claims.

Elliott brought its claims on its own behalf and as a representative of the putative class. The proposed class consisted of all present and former owners of royalty and overriding royalty interests[4] in Appellees' leases and wells in the San Juan Basin. The class comprises approximately 4859 ConocoPhillips royalty and

---

[4]An "overriding royalty" is "a royalty carved out of a working interest created by an oil, gas, or mining lease." *Cont'l Potash, Inc. v. Freeport-McMoran, Inc.*, 858 P.2d 66, 69 n.2 (N.M. 1993) (citing 2 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law* § 418, at 344 (1992)).

overriding royalty interest owners and 5894 BP royalty and overriding royalty interest owners, including the State of New Mexico. Elliott asserted jurisdiction under 28 U.S.C. §§ 1331, 1337 and 15 U.S.C. § 15 with regard to the antitrust claims, and under 28 U.S.C. § 1332 with regard to the state-law claims, alleging that Plaintiffs had a good faith belief that they satisfied the amount in controversy requirement.

Appellees opposed class certification and filed a motion to dismiss for lack of subject matter jurisdiction arguing that Elliott, the named Plaintiff, and a substantial majority of the class members could not satisfy the $75,000 amount in controversy requirement necessary to vest the federal court with diversity jurisdiction pursuant to 28 U.S.C. § 1332. Appellees also sought dismissal of the antitrust claim.

In an order dated January 10, 2001, the district court dismissed Elliott's antitrust claim, thereby eliminating any basis for federal question jurisdiction. In an order dated March 7, 2001, the court concluded that Elliott met the amount in controversy requirement and that diversity jurisdiction thereby existed over Elliott's state-law claims. Subsequently, in September 2001, the district court certified a class and concluded that the amount in controversy requirement for diversity jurisdiction over the class was satisfied by aggregating damages. This

court refused to review the class certification order and the issue of subject matter jurisdiction on an interlocutory basis.

Appellees moved for summary judgment on the UPA and Payment Act claims. The district court originally denied this motion in an order dated July 1, 2002. This order was subsequently vacated in December 2003. Dist. Ct. Order No. 4. Elliott moved for partial summary judgment on its implied duty claims. Appellees opposed that motion and filed a cross-motion for summary judgment on the implied duty to market claim and on the meaning of their royalty obligations under the "at the well" lease provisions. ConocoPhillips requested summary judgment on both the extent of its royalty obligations under its "same as fed" leases and its compliance with those obligations. Elliott moved for partial summary judgment on its fraud and constructive fraud claims. Appellees sought summary judgment on all three tort claims and the unjust enrichment claim.

In a series of five orders issued on December 30, 2003, the district court entered summary judgment against Elliott and the class on all of its remaining claims and entered final judgment in favor of Appellees, concluding that the relationship between the parties was governed solely by the express terms of the leases and that the non-contract claims necessarily failed. Elliott challenges on appeal all of the orders, including the earlier dismissal of the antitrust claim.

Shortly after Elliott filed suit in federal district court, a separate group of litigants, unnamed members of the certified class, filed a state class action in Santa Fe District Court which was stayed pending resolution of the federal matter. In August 2000, the state litigants, Laura Dichter, Romero Family Limited Partnership, and J. Glenn Turner [hereinafter and collectively, "Dichter"], filed a motion to intervene for the limited purpose of opposing Elliott's attempt to seek an injunction prohibiting Appellees and Dichter from entering into a settlement agreement in the state court action. When Elliott withdrew its motion for an injunction, Dichter withdrew its motion to intervene. In addition, when Appellees sought an interlocutory appeal of the district court's decision concluding that subject matter jurisdiction existed and of the district court's order certifying the class, Dichter moved to join in that request by filing an Amicus Curiae Brief. This court denied the motion for an interlocutory appeal.

After the district court entered final judgment for Appellees on December 30, 2003, Dichter filed a motion on January 7, 2004 to intervene in order to challenge subject matter jurisdiction. Elliott filed its notice of appeal on January 15, 2004 (Case No. 04-2006). The district court entered an order denying Dichter's motion to intervene on January 26, 2004. The court suggested that the motion was not timely but concluded that it lacked jurisdiction to address the motion since the district court was divested of jurisdiction upon the filing of

-13-

Elliott's notice of appeal. Dichter filed a "Motion to Confirm Party Status or, Alternatively, to Intervene and Establish a Briefing Schedule" in Elliott's appeal, Case No. 04-2006. This court denied Dichter party status in Elliott's appeal in an order dated March 22, 2004. In that order the court said the alternative request to allow intervention in Elliott's appeal would be decided by the panel. Dichter has also filed a separate appeal, Case No. 04-2014, challenging the denial of their motion to intervene and challenging the class certification order and final judgment based on a lack of subject matter jurisdiction. Appellees have moved to dismiss the portions of Dichter's appeal not related to the district court's denial of Dichter's motion to intervene.

## III. DISCUSSION

### A. Motion to Intervene

Intervention as a matter of right is governed by Rule 24(a) of the Federal Rules of Civil Procedure. Although the Federal Rules of Civil Procedure apply only in the district court, "the policies underlying intervention may be applicable in appellate courts." *UAW Local 283 v. Scofield*, 382 U.S. 205, 216 n.10 (1965). Accordingly, a party seeking intervention on appeal must satisfy the prerequisites of Rule 24(a). *See, e.g.*, *Warren v. Comm'r*, 302 F.3d 1012, 1014-15 (9th Cir. 2002); *Bldg. and Constr. Trades Dep't v. Reich*, 40 F.3d 1275, 1282-83 (D.C. Cir. 1994). Under Rule 24(a), an applicant may intervene as a matter of right if (1)

the application is timely, (2) the applicant claims an interest relating to the property or transaction which is the subject of the action, (3) the applicant's interest may be impaired or impeded, and (4) the applicant's interest is not adequately represented by existing parties. *Coalition of Ariz./N.M. Counties for Stable Econ. Growth v. Dep't of Interior*, 100 F.3d 837, 840 (10th Cir. 1996). The Tenth Circuit generally follows a liberal view in allowing intervention under Rule 24(a). *Nat'l Farm Lines v. ICC*, 564 F.2d 381, 384 (10th Cir. 1977). When intervention was not sought below, however, intervention on appeal will be permitted "only in an exceptional case for imperative reasons." *Hutchinson v. Pfeil*, 211 F.3d 515, 519 (10th Cir. 2000) (quotations omitted).

The requirements of Rule 24(a) are satisfied under the circumstances of this case. Dichter, as an unnamed member of the putative class and as a litigant in the state court action, has a sufficient interest in the transactions underlying this action to justify intervention. *See* Fed. R. Civ. P. 24(a); *Coalition of Ariz./N.M. Counties*, 100 F.3d at 840 (noting that the interest must be "direct, substantial, and legally protectable" (quotations omitted)). Dichter is seeking to intervene solely to challenge the existence of subject matter jurisdiction over the class. Appellees consistently contested the existence of federal subject matter jurisdiction. Upon entry of final judgment, however, it was no longer in Appellees' interest to challenge class certification by raising jurisdictional

questions.  Neither is Elliott, who continues to argue in support of the existence of subject matter jurisdiction over the class, able to represent Dichter's interest. If Dichter is correct that there is no subject matter jurisdiction over the class, any adverse judgment would not be binding on the class.  Because, at this stage in the litigation, neither party has an interest in contesting subject matter jurisdiction, Dichter's interest may be harmed if Dichter is not permitted to intervene on appeal.  *See* Fed. R. Civ. P. 24(a).

"The timeliness of a motion to intervene is assessed in light of all the circumstances, including the length of time since the applicant knew of his interest in the case, prejudice to the existing parties, prejudice to the applicant, and the existence of any unusual circumstances."  *Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1250 (10th Cir. 2001) (quotation omitted).  Prior to the district court's entry of final judgment it was reasonable for Dichter to rely on Appellees to argue the issue of subject matter jurisdiction.[5]  *Cf. United Airlines,*

_____

[5]When the district court certified the class, Appellees sought an interlocutory appeal in this court and Dichter attempted to file an amicus brief in support of Appellees.  After this court denied the motion for an interlocutory appeal, Dichter's intervention at that point would have been futile because the issue of subject matter jurisdiction had been settled in the district court. Moreover, as noted above, it was in the interest of Appellees to continue to contest class certification until the district court ruled in their favor on the merits.

Elliott argues that Dichter could have exercised its right to opt-out of the class.  The district court, however, certified the class under Rules 23(b)(1), (2), and (3).  Unlike certification under Rule 23(b)(3), certification under Rules 23(b)(1) and (2) carries no right to opt-out.  *See* Fed. R. Civ. P. 23(c)(2)(B).

*Inc. v. McDonald*, 432 U.S. 385, 394-96 (1977) (holding that post-judgment application for intervention was timely). Although Elliott asserts that allowing Dichter to intervene will cause additional delay and expense, any prejudice to either party resulting from Dichter's intervention on appeal is minimal compared with the importance of addressing the question of subject matter jurisdiction. Thus, Dichter's motion to intervene is timely. Dichter has therefore satisfied the requirements of intervention under Rule 24(a).

The imperative reason advanced by Dichter in its argument that it should be permitted to intervene on appeal is that neither of the parties will raise or adequately address the issue of subject matter jurisdiction. The issue of subject matter jurisdiction is essential to this court's review and while we would address it without regard to whether the parties dispute its existence, our inquiry is aided by the presence of an interested party like Dichter.[6] *Cf. Duplan v. Harper*, 188 F.3d 1195, 1203 (10th Cir. 1999) (permitting intervention to challenge subject matter jurisdiction). Additionally, as discussed above, it is not in the interests of either Elliott or Appellees to argue the lack of subject matter jurisdiction over the

_____

[6]In an order dated October 25, 2004, this court granted Dichter five minutes at oral argument to discuss "the party status, intervention and jurisdictional issues." In addition to the arguments made in its motion to intervene, Dichter substantively briefed the question of subject matter jurisdiction in its own appeal (Case No. 04-2014) and the other parties responded to those arguments. We treat all briefing related to the existence of subject matter jurisdiction as part of Dichter's motion to intervene on appeal.

class. Because Dichter has satisfied the Rule 24(a) requirements and advanced an imperative reason to justify intervention at this stage of the litigation, Dichter's motion to intervene on appeal for the sole purpose of challenging the existence of subject matter jurisdiction over the class is granted. In light of our disposition of Dichter's motion to intervene on appeal, Dichter's appeal of the district court's denial of its motion to intervene for the limited purpose of challenging subject matter jurisdiction is dismissed as moot.

**B. Subject Matter Jurisdiction**

In concluding that it had subject matter jurisdiction over the class action, the district court said:

> The putative Class members may aggregate their damages when they have united to enforce a single title or right in which they have a common and undivided interest. *Snyder v. Harris*, 394 U.S. 332, 335 (1969). Plaintiff has alleged and demonstrated a single title or right in which putative class members have a common and undivided interest because the putative class members hold common and undivided interests in the properties, leases and units producing gas, which is then processed from a single commingled stream by Defendants, and the pool of commingled NGLs, such that damages can be aggregated class-wide.
> Thus, I find that, considering historical damages and prospective relief, together with the aggregation of claims against both Defendants, the joint liability of Defendants, disgorgement, statutory penalties, punitive damages, and attorneys' fees, the Plaintiff has shown the Class members had a good faith basis for pleading the amounts in controversy at the time the action was commenced and that it would not be legally impossible for the Class members to recover the minimum jurisdictional amount.

Dist. Ct. Order dated Sept. 6, 2001, at 4.

-18-

The rule in this circuit is that each plaintiff in a diversity-based class action must meet the required jurisdictional amount in controversy. *Leonhardt v. W. Sugar Co.*, 160 F.3d 631, 641 (10th Cir. 1998). Thus, jurisdiction over the class is not established merely because the named plaintiff can meet the $75,000 requirement. *Id.* Before the district court, Appellees questioned whether the individual unnamed class members could satisfy the $75,000 amount in controversy requirement of 28 U.S.C. § 1332(a). The ruling of the district court finding the existence of subject matter jurisdiction over the class claims relies solely on a theory of aggregation to meet the amount in controversy requirement of 28 U.S.C. § 1332(a). The ultimate question of whether diversity jurisdiction exists is a mixed question of law and fact to be reviewed *de novo*, with any factual findings of the district court reviewed for clear error. *Aves ex rel. Aves v. Shah*, 997 F.2d 762, 766 (10th Cir. 1993).

The general rule is that "separate and distinct claims of two or more plaintiffs cannot be aggregated in order to satisfy the jurisdiction amount requirement." *Snyder v. Harris*, 394 U.S. 332, 335 (1969). Aggregation is only permitted when a single plaintiff seeks to aggregate two or more of its own claims against a defendant or "in cases in which two or more plaintiffs unite to enforce a

single title or right in which they have a common and undivided interest."[7]  *Id.*

The paradigm cases for permitting the aggregation of claims "are those which

involve a single indivisible res, such as an estate, a piece of property (the classic

example), or an insurance policy.  These are matters that cannot be adjudicated

without implicating the rights of everyone involved with the res."  *Gilman v. BHC*

*Sec., Inc.*, 104 F.3d 1418, 1423 (2d Cir. 1997) (quotation omitted).  However,

> [i]t is not enough that the dispute involve a common piece of
> property–the class members must also share a common interest in the
> collection of a single liability.  An identifying characteristic of a
> common and undivided interest is that if one plaintiff cannot or does
> not collect his share, the shares of the remaining plaintiffs are
> increased.

*Kessler v. Nat'l Enters., Inc.*, 347 F.3d 1076, 1079 (8th Cir. 2003) (quotation

omitted) (rejecting aggregation when the class members were attempting to

enforce rights under individual contracts involving a single timeshare property);

*see also Thomson v. Gaskill*, 315 U.S. 442, 447 (1942) ("Aggregation of

plaintiffs' claim cannot be made merely because the claims are derived from a

---

[7]Contrary to Elliott's suggestion, the availability of aggregation does not depend upon under which particular subsection of Rule 23 class certification is granted.  *Snyder v. Harris*, 394 U.S. 332, 336 (1969) ("The doctrine that separate and distinct claims could not be aggregated was never, and is not now, based upon the categories of old Rule 23 or of any rule of procedure.  That doctrine is based rather upon this Court's interpretation of the statutory phrase 'matter in controversy.'").

single instrument or because the plaintiffs have a community of interest." (citations omitted)).

Here, the class members' claims do not involve a single indivisible res. On the contrary, each class member is the owner of a separate and distinct royalty interest. As such, each royalty owner has an individual claim for any underpayment of royalties which would have no effect on the claims of the other class members. While it is true that the individual claims have in common many questions of fact and law, and the royalty owners have a shared interest in the manner in which the gas is collected and the royalty is calculated, the royalty owners do not possess a "common and undivided interest" in either the royalty payments or the natural gas supply. *See Kary v. ExxonMobil Corp.*, No. A1-03-009, 2002 WL 32067456 at *4 (D.N.D. Mar. 19, 2002); *see also Coulter v. Anadarko Petroleum Corp.*, No. 98-1413-WEB, 1999 WL 1253031 at *3 (D. Kan. Oct. 8, 1999) (acknowledging the court's consistent rejection of attempts at aggregating the claims of oil and gas royalty owners). *Cf. Craig v. Champlin Petroleum Co.*, 421 F.2d 236, 240 (10th Cir. 1970) (recognizing as impermissible the aggregation of claims seeking to recover royalties allegedly due under oil and gas leases). *But see Williams v. Humble Oil & Ref. Co.*, 234 F. Supp. 985, 988 (E.D. La. 1964) (noting that because the claims are joint or common between mineral and royalty owners the claim of each class member may be aggregated).

As a consequence, permitting the class members to sue individually to enforce their own royalty rights would have no effect on the royalty rights of other putative class members.

Elliott relies heavily on *Rocket Oil and Gas Co. v. Arkla Exploration Co.*, 435 F. Supp. 1303 (W.D. Okla. 1977), to support its aggregation theory. The district court in *Rocket Oil* held that under an Oklahoma statute,

> each lessee selling gas is required to pay 1/8 of the proceeds of its sale of gas to all of the royalty owners in the unit. Therefore, it appears that the class members have a common and undivided interest in the 1/8 royalty interest in all gas produced from the pooled formation by virtue of the communitization of their fractional mineral interests under the polling order.

*Id.* at 1305. As another district court in this circuit noted, however, *Rocket Oil* "is clearly predicated on the existence of a unique 'pooling order'" which is distinct from the situation here in which the gas producer must "pay *each* of the royalty owners according to their individual royalty interests in their respective leases." *Leroy Cattle Co. v. Fina Oil & Chem. Co.*, No. 93-1286-MLB, 1994 WL 151105 at *6 (D. Kan. Mar. 2, 1994). *Rocket Oil* is thus distinguishable and does not support the district court's use of aggregation in this case.

In the present case the district court erred when it relied on a theory of aggregation to conclude that unnamed class members could meet the amount in controversy requirement of 28 U.S.C. § 1332(a). We therefore remand the claims

of the class to the district court with instructions to vacate the final judgment as to the unnamed members of the plaintiff class, decertify the class, and dismiss the claims of the class without prejudice.[8] *Cf. Rector v. City & County of Denver*, 348 F.3d 935, 949-50 (10th Cir. 2003). There is no barrier, however, to considering Elliott's claims as an individual plaintiff, thus the district court's disposition of Elliott's claims in favor of Appellees is addressed below.

## C. Elliott's Appeal

### 1. Standard of Review

This court conducts *de novo* review of the district court's dismissal for failure to state a claim and the district court's grant of summary judgment, applying the same legal standard as the district court. *Hartman v. Kickapoo Tribe Gaming Comm'n*, 319 F.3d 1230, 1234 (10th Cir. 2003). A motion to dismiss for

---

[8]Before the district court, Elliott argued that the members of the class satisfied the amount in controversy requirement whether damages were aggregated or assessed on an individual basis. The question of whether the unnamed members of the class could satisfy the amount in controversy requirement individually was contested by Appellees and both sides submitted evidence in support of their arguments. The district court, however, made no factual findings regarding whether the class members could individually satisfy the amount in controversy requirement and we decline to do so on appeal. In addition, because we affirm the district court's dismissal of Elliott's antitrust claim for failure to state a claim, *see* discussion *infra* Part III.C.2.h, there is no basis for federal question jurisdiction. *Cf. United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (noting that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well").

failure to state a claim "admits all well-pleaded facts in the complaint as distinguished from conclusory allegations." *Mitchell v. King*, 537 F.2d 385, 386 (10th Cir. 1976). When applying the *de novo* standard of review to the district court's grant of summary judgment, we "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Martin v. Kansas*, 190 F.3d 1120, 1129 (10th Cir. 1999).

*2. Elliott's Argument*

Elliott challenges the 39% processing charge on two grounds: (1) the extraction of NGLs is not a post-production cost legitimately deducted in calculating the value at the wellhead; and (2) even if it is a legitimate post-production cost, the fee is neither actual nor reasonable. The purpose of the challenge to the processing fee is to establish underpayment of royalties. Elliott, however, has never asserted an unequivocal and straight-forward contract claim alleging a breach of Appellees' express obligations to pay royalties.[9] In fact,

---

[9]*See* Dist. Ct. Order No. 1 at 2 ("Elliott makes claims under various theories, none of which is a breach of contract theory."); Dist Ct. Order No. 4 at 6 ("Despite the contractual nature of the relationship of the parties, Plaintiffs have not filed a claim for breach of contract."); Dist. Ct. Order No. 5 at 4 ("If there is one common thread throughout Plaintiffs' arguments in this case, it is that Plaintiffs do not want to pursue the obvious claim to recover from Defendants for their alleged failure to pay appropriate royalties. Plaintiffs have filed three complaints, yet have not plead breach of contract."); Aplt.'s Opening Br. at 24 ("Defendants' liability for th[eir] conduct does not turn upon the express contract terms contained in the royalty interests of the Class members."); *see generally*

(continued...)

Elliott steadfastly disclaims any cause of action for breach of an express contract.[10]

While not retracting its unequivocal disclaimer of a cause of action for breach of an express contract, Elliott attempts to ameliorate the possible

_____

[9](...continued)
Second Amended Complaint.

[10]At oral argument Elliott reiterated its rejection of a claim for breach of express contract, saying that because the royalty obligations do not have language addressing processing costs or the allocation of those costs, such a claim is impossible. Elliott even went so far as to disclaim reliance on a theory of breach of express contract for its claim under the Payment Act.

Elliott's avoidance of a breach of contract claim may be rooted in its attempt to secure class certification. *See* Aplt.'s Opening Br. at 24 (noting that because this case is about the "conduct" of ConocoPhillips and BP, Defendants failed in their attempt to defeat class certification by pointing out the huge number of individual contracts at issue). Presumably, pleading a breach of contract claim on behalf of approximately 10,000 royalty owners would have made class certification less likely. *See* Fed. R. Civ. P. 23(a)(2) (commonality). Under New Mexico contract law, for example,

> even if the language of the contract appears to be clear and unambiguous, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance, in order to decide whether the meaning of a term or expression contained in the agreement is actually unclear.

*Mark V, Inc. v. Mellekas*, 845 P.2d 1232, 1235 (N.M. 1993) (quotation omitted). The disrict court recognized that Elliott's choice to avoid pleading a breach of contract claim was a strategic one and noted that the court was "impressed that all of Plaintiffs' claims have been constructed to avoid being constrained by its contracts and by New Mexico interpretation of such documents as contained in *Creson v. Amoco Production Co.*, 10 P.3d 853 (N.M. Ct. App. 2000), and the cases upon which *Creson* relies." Dist. Ct. Order No. 5 at 4.

consequences of this strategic decision by suggesting that its claims are at least

contextually contractual and that an express contract claim is impossible because

the royalty provisions are silent with respect to the 39% fee. That the royalty

instruments make no mention of a 39% figure, however, does not preclude an

express contract claim. Oil and gas leases are interpreted like any other contract.

*Harvey E. Yates Co. v. Powell*, 98 F.3d 1222, 1229-30 (10th Cir. 1996). If a

contract is ambiguous, the jury or the court must engage in factfinding to

determine the meaning of the contract.[11] *See Allsup's Convenience Stores, Inc. v.*

*North River Ins. Co.*, 976 P.2d 1, 12 (N.M. 1999). Indeed, courts routinely

address claims for underpayment of royalties based upon royalty instruments

which do not specify the allocation of costs.[12] Contrary to Elliott's

---

[11]The determination of whether a contract is ambiguous is a question of law. *Sanchez v. Borrego*, 86 P.3d 617, 619 (N.M. Ct. App. 2004). A contract is ambiguous if it is "reasonably and fairly susceptible of different constructions." *Id.* "[I]n determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance." *C.R. Anthony Co. v. Loretto Mall Partners*, 817 P.2d 238, 242-43 (N.M. 1991) (footnote omitted). "Further, the language of the entire agreement should be construed together." *Allsup's Convenience Stores, Inc. v. North River Ins. Co.*, 976 P.2d 1, 12 (N.M. 1999).

[12]*See, e.g.*, *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1152-53 (10th Cir. 2000) (recognizing that analysis of whether certain expenses qualify as deductible transportation costs depends, at least in part, on the language of the lease contracts); *Harvey E. Yates Co. v. Powell*, 98 F.3d 1222, 1229-30, 1236 (10th Cir. 1996) (finding the royalty clause directing the lessee to

(continued...)

remonstrations, its strategy in forsaking any claim for breach of express contract is significant. Elliott's refusal to pursue such a contract claim is a rejection of the very foundation of its relationship with Appellees giving rise to any duties, including the core duty of royalty payment. Elliott's choice has effectively preempted the question of whether the express royalty provisions are ambiguous and, if so, how the ambiguity is to be resolved, a rather pedestrian matter to resolve in a contract dispute. *See supra* n.11.

In lieu of a claim for breach of an express contract, Elliott has asserted claims such as breach of implied covenants, conversion, fraud, and unjust enrichment. Each of these alternative claims is built upon and dependent on the underlying express contractual obligation to pay royalties. As a consequence, it is impossible to fully adjudicate the claims in the absence of a claim for breach of

---

[12](...continued)
"pay the lessor as royalty one-eighth of the cash value of the gas . . . produced and saved from the leased premises" to be unambiguous and concluding that lessee must pay royalties on certain portions of settlement proceeds); *Piney Woods Country Life Sch. v. Shell Oil Co.*, 726 F.2d 225, 240 (5th Cir. 1984) (determining the propriety of processing deductions under a "market value at the well" royalty clause); *Martin v. Glass*, 571 F. Supp. 1406, 1410-11, 1415-16 (N.D. Tex. 1983) (interpreting royalty provisions to permit deduction of compression charges); *Creson*, 10 P.3d at 859 (holding that the "net proceeds derived from the sale of Carbon Dioxide Gas at the well" clause is not ambiguous); *Cont'l Potash, Inc.*, 858 P.2d at 80-81 (construing royalty contracts). *But see Rogers v. Westerman Farm Co.*, 29 P.3d 887, 896 (Colo. 2001) (en banc) (reaching the implied duty to market claim after first concluding that the "at the well" leases were silent as to the allocation of post-production costs).

an express contract to pay royalties. Most importantly, our evaluation of these alternative claims to determine whether they are consistent or inconsistent with the underlying contracts is further hampered by the condition of the record. The record contains no royalty instruments and only a few examples of overriding royalty instruments which were submitted by Appellees.[13] Regardless of whether this is a result of Elliott's strategic choice not to allege an express contract claim or disputes over discovery, it further illustrates the difficulty of considering Elliott's claims premised on implied covenants, fraud, conversion, and unjust enrichment.

*a. Meaning of "At the Well"*

The district court granted Appellees' motion for summary judgment on its "at the well" obligations under the royalty contracts. Dist. Ct. Order No. 1 at 2. The court concluded that the meaning of the "at the well" language is clear and unambiguous: under *Creson v. Amoco Production Co.*, 10 P.3d 853 (N.M. Ct. App. 2000), royalties are "to be paid on the value of the gas in its unprocessed state as it comes to the surface at the mouth of the well before it is transported and processed." *Id.* at 7. The "adjustment" for removing the NGLs so the gas is marketable, the district court said, is consistent with the "at the well" language of the royalty obligations. *Id.* at 8.

_____

[13]Appellees assert that Elliott owns only overriding royalty interests.

On appeal Elliott argues that the district court erred in reading the terms of the royalty obligations as consistent with the 39% processing charge. Elliott argues that the district court erroneously read *Creson* as holding that the "net proceeds/work-back" method is "the approved method" of calculating royalty payments in New Mexico. Moreover, Elliott contends the district court wrongly decided that, in calculating the royalties owed to Elliott under the work-back method, Appellees could deduct a fictitious 39% fee that was never actually incurred in processing the gas. Elliott asserts that only those "actually incurred and reasonable costs" can be deducted in calculating the royalty owed. Elliott further argues that, as part of its erroneous decision, the district court improperly concluded that the gas in this case was marketable at the wellhead.

Appellees counter that the royalty instruments contain express language governing Appellees' royalty obligations to Elliott. Appellees assert that under the "at the well" language they are required to pay royalties based on the value of the refined natural gas products less any post-production costs. One of the alleged post-production costs which Appellees deduct from the value of the refined natural gas products is the 39% charge for processing the gas at their jointly-owned Plant. Appellees argue that the district court correctly concluded that New Mexico law does not support Elliott's theory that only those "actually incurred and reasonable" costs can be deducted. Royalties, Appellees argue, are

owed only on the value of the gas as it emerges from the wellhead. Furthermore, Appellees argue that royalty payments are a matter of contract and not dependent upon whether the gas is marketable.

As indicated, the posture of this case is unusual in that Elliott declined to bring and affirmatively disclaims a breach of contract claim. Yet, it appears impossible to resolve this case without assessing the meaning of the "at the well" contractual language. All parties agree that the royalty instruments contain language that requires royalties to be paid based on "the market value of the gas at the well as produced" (unless they require payment based on a "same as fed" basis) and nowhere do these instruments specifically mention the 39% figure.

The district court did not err in relying on *Creson* for guidance in determining the meaning of "at the well." In *Creson*, the Court of Appeals of New Mexico recognized that "[a] royalty or other nonoperating interest in production is usually subject to a proportionate share of the costs incurred subsequent to production where the royalty or nonoperating interest is payable at the well." 10 P.3d at 857 (quotations omitted). The *Creson* court reasoned that the phrase "net proceeds derived from the sale of Carbon Dioxide Gas at the well" is "unambiguous and means that Plaintiffs are entitled to royalties based on the value of the carbon dioxide gas as it emerges at the wellhead." *Id.* Under this language, the *Creson* court held that "royalties for gas sold downstream were

subject to deductions for post-production, value-enhancing costs." *Id.* at 862.

Although the instruments in the present case refer to "market value" as opposed

to "net proceeds," the *Creson* court used the terms interchangeably and cited with

approval a Fifth Circuit case, *Piney Woods Country Life School v. Shell Oil Co.*,

726 F.2d 225 (5th Cir. 1984), which interpreted the meaning of "market value."[14]

*Creson*, 10 P.3d at 858. The *Creson* court therefore appeared to see no difference

between the terms "net proceeds" and "market value," but rather focused on the

fact that the "at the well" language means that post-production costs are deducted

from the value of the processed carbon dioxide gas in arriving at the proper

royalty valuation. *Id.*

The district court concluded that because the phrase "at the well" means

that royalty is paid on the value of unprocessed gas as it emerges at the wellhead,

the challenged "adjustments result in royalty payments consistent with the value

of the gas 'as it emerges at the wellhead.'"[15] Dist. Ct. Order No. 1 at 8. The "at

---

[14]The court in *Piney Woods* interpreted "market value" to mean current value at the time of production, not actual proceeds less expenses. *Piney Woods Country Life Sch.*, 726 F.2d at 235-36. The *Piney Woods* court went on to describe several methods used to calculate market value, including deducting processing costs from the sales of processed gas. *Id.* at 238-41.

[15]Appellees argued before the district court that "the applicable law demonstrates [they] are entitled to summary judgment both as to the nature of their royalty obligations as well as their compliance with those unambiguous obligations." The district court apparently agreed, relying on its conclusion with

(continued...)

the well" royalty obligations do require royalty payments based on the unprocessed gas as it emerges at the wellhead. Whether Appellees' complied with these "at the well" royalty obligations, however, depends upon whether the 39% "charge" is a post-production cost that may properly be deducted under the net-back or work-back methodology in order to arrive at the correct "at the well" value. To determine compliance, there would appear to be at least three questions which must be answered: (1) whether the 39% fee is properly characterized as a "processing cost" such that it is a post-production cost subject to deduction; (2) whether such deductible costs must be "actual and reasonable"[16] and, if so, whether the 39% is an "actual and reasonable" cost; and (3) whether the gas is in fact marketable at the wellhead. In *Creson*, these issues were not disputed. 10 P.3d at 856, 859 (noting that plaintiffs did not dispute the type of cost deducted or whether the costs were not the actual costs or were inflated; plaintiffs conceded the carbon dioxide gas was marketable at the wellhead).

---

[15](...continued)
regard to the meaning of the "at the well" leases to determine Appellees were "acting in conformity with contractual provisions." Dist. Ct. Order No. 2 at 5.

[16]The Fifth Circuit in *Piney Woods*, for example, agreed with plaintiffs that "the processing costs, under both the 'market value' and 'amount realized' provisions, must be reasonable." 726 F.2d at 241.

Without resolution of these issues, which are substantially factual questions,[17] it is not possible to determine whether the challenged "adjustments result in royalty payments consistent with the value of the gas 'as it emerges at the wellhead.'" Dist. Ct. Order No. 1 at 8. It was therefore improper for the district court to decide that Appellees complied with their "at the well" royalty obligations. This, however, does not affect our disposition of Elliott's claims. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Elliott's noncontractual claims do not depend upon or require construction or interpretation of the "at the well" language of the royalty obligations. Indeed, Elliott's claims fail as a matter of law regardless of the meaning of the "at the well" language. Thus, these outstanding factual questions regarding the proper construction and application of the "at the well" royalty obligations are neither genuine nor material issues. *See* Fed. R. Civ. P. 56(c). The district court's grant of summary judgment in favor of Appellees is therefore affirmed. *See United States v. Sandoval*, 29 F.3d 537, 542 n.6 (10th Cir. 1994) ("We are free to affirm a district court decision on any

---

[17]Of the three questions posed, only the first part of No. 2 is a question of law.

grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." (quotations omitted)).

*b. Implied Covenants*

The district court concluded that the royalty instruments creating the obligations between the parties required the rejection of any claims of implied covenants between the parties. Dist. Ct. Order No. 2 at 3. The court held that because Appellees paid the royalty obligations owed to Elliott pursuant to methodologies approved by New Mexico courts, it was impossible to conclude that Appellees violated any implied covenant of good faith and fair dealing. *Id.* at 5. Thus, the district court denied Elliott's summary judgment motion on the implied covenant of good faith and fair dealing and *sua sponte* dismissed that count as moot. The court granted Appellees' summary judgment motion on Elliott's implied duty to market claim and dismissed Count 4. The court concluded that an implied duty to market "cannot co-exist with express covenants that specifically cover the same subject matter." *Id.* at 6.

On appeal Elliott urges that because the royalty instruments are silent on the calculation of the royalty owed by Appellees, implied covenants govern how the royalties should be calculated. These implied covenants, Elliott asserts, do not permit Appellees to deduct costs incurred before a gas is in a marketable

condition nor do the implied covenants permit Appellees to deduct costs that are not actually incurred or are unreasonable.

Appellees argue that their royalty obligations are governed solely by the express provisions of the royalty instruments themselves and any implied covenants cannot alter Appellees' obligations. In addition, Appellees argue that implied duties do not provide independent claims for relief because such implied covenants are, by definition, implied in contracts and they may only be asserted as part of a breach of contract claim. Even if Elliott is correct that implied covenants exist in this case, Appellees assert that the implied covenant of good faith and fair dealing and the implied duty to market do not support Elliott's "actually incurred and reasonable" theory of the deductibility of post-production costs.

In New Mexico, oil and gas leases are interpreted like any other contract. *Harvey E. Yates Co.*, 98 F.3d at 1229-30; *see also Cont'l Potash, Inc. v. Freeport-McMoran, Inc.*, 858 P.2d 66, 80 (N.M. 1993) ("In interpreting mining agreements, courts generally have applied the rules for interpreting contracts and leases."). "The primary objective in construing a contract is to ascertain the intention of the parties." *Cont'l Potash, Inc.*, 858 P.2d at 80 (quotation omitted). The intent of the parties is "deduced from the language employed by them." *Id.*

"[W]hen parties reduce their agreements to writing, the written instrument is presumed to embody their entire contract, and the court should not read into the instrument additional provisions unless this be necessary in order to effectuate the intention of the parties as disclosed by the contract as a whole.  An implied covenant must rest entirely on the presumed intention of the parties as gathered from the terms as actually expressed in the written instrument itself, and it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it, and therefore omitted to do so, or it must appear that it is necessary to infer such a covenant in order to effectuate the full purpose of the contract as a whole as gathered from the written instrument.  It is not enough to say that an implied covenant is necessary in order to make the contract fair, or that without such a covenant it would be improvident or unwise, or that the contract would operate unjustly.  It must arise from the presumed intention of the parties as gathered from the instrument as a whole."

*Id.* (quoting *Kingsley v. W. Natural Gas Co.*, 393 S.W.2d 345, 350-51 (Tex. Civ. App. 1965)).  The Supreme Court of New Mexico went on to say that

implied covenants are not favored in law, especially when a written agreement between the parties is apparently complete.  The general rule is that an implied covenant cannot co-exist with express covenants that specifically cover the same subject matter.

When it is clear, however, from the relevant parts of the contract taken together and considered with the facts and circumstances surrounding the execution of the agreement, that the obligation in question was within the contemplation of the parties or was necessary to effect their intention, then such obligation may be implied and enforced.  But when the contract between the parties speaks to the obligation sought to be implied, the courts will not write that implied obligation into the contract.  Stated conversely, there may be an implied covenant on the part of the lessee (in the absence of any expressed on the subject as in the lease).[18]

_____

[18]In *Cont'l Potash, Inc.*, the New Mexico Supreme Court concluded that
(continued...)

*Id.* (citations, alterations, and quotation omitted). *See also Nearburg v. Yates Petroleum Corp.*, 943 P.2d 560, 569 (N.M. Ct. App. 1997) (holding that "courts cannot imply covenants which are inconsistent with express provisions"). Thus, in accordance with New Mexico law, any analysis of implied covenants between parties that have a contractual relationship must be linked to an examination of the contractual agreements themselves.

### i. Implied Duty to Market

New Mexico has long recognized "an implied covenant on the part of the lessee (in the absence of any expressed on the subject as in [the] lease) that after production of oil and gas in paying quantities is obtained, he will thereafter continue the work of development for production of oil and gas with reasonable diligence as to the undeveloped portion of the leased land." *Libby v. DeBaca*, 179 P.2d 263, 265 (N.M. 1947). In addition, the lessee "must proceed with reasonable diligence, as viewed from the standpoint of a reasonably prudent operator, having in mind his own interest as well as that of the lessor, to market the product." *Id.* In *Libby* the court said that this duty to market included building a plant to convert the gas into dry ice because that was the only way the gas could be sold.

---

[18](...continued)
because the contract provisions granted defendants exclusive discretion and control in the mining operations, the court was precluded from reading any implied covenants into the contract. 858 P.2d at 81.

*Id.* The New Mexico Supreme Court later characterized the implied duty to market as an "implied covenant to make diligent efforts to market the production in order that the lessor may realize on this royalty interest." *Darr v. Eldridge*, 346 P.2d 1041, 1044 (N.M. 1959) (quotation omitted). In *Darr* the court was faced with a situation where the lessee was holding onto the property without selling the minerals. *Id.*

Elliott argues that Appellees are obligated under this implied duty to market to pay royalties on the actual price received by Appellees for the gas and NGLs and that Appellees' conduct in taking excessive cost deductions and failing to pay royalties on the best price reasonably possible breached that duty. Elliott, however, is unable to demonstrate that such an implied duty exists in this case. Elliott's assertion that the 39% "processing charge" is not addressed in the royalty leases is unavailing. In a situation where, as here, the parties have reduced their agreement to writing in the form of an oil and gas lease or other royalty instrument, it is to that agreement that we must turn to decide whether any implied duty to market was intended by the parties or would contradict the express provisions of that agreement. *Cont'l Potash, Inc.*, 858 P.2d at 80. Elliott, however, attempts to divorce its implied duty to market claim from its contractual relationship with Appellees and, in fact, explicitly disclaims reliance on the express provisions of the royalty agreements. This court cannot speculate as to

what those various agreements contain or how to construe the scope of any implied covenant to market that may exist.

Even if we were to ignore Elliott's strategic choice to avoid reliance on the express contractual language, Elliott's implied duty to market claim would still fail. Elliott relies on this implied duty to supplement the royalty provisions and the "at the well" language, but under New Mexico law, covenants are not implied for subjects that are treated in express provisions. *See id.* at 80 ("[I]mplied covenant[s] cannot co-exist with express covenants that specifically cover the same subject matter."). Moreover, Elliott has failed to suggest how, under New Mexico law, Appellees have breached the implied duty to market. Appellees were and are actively producing gas, processing the gas, and selling the refined natural gas and NGLs. Thus, Appellees have complied with the implied duty to market as articulated by the New Mexico courts. *See Darr*, 346 P.2d at 1044. Elliott contends that under the implied duty to market Appellees bear the burden of all costs incurred to put the gas in a marketable condition including the cost of removing the NGLs from the gas. Thus, Elliott argues any 39% processing fee should not be borne by the royalty owners. This conception of the implied duty to market finds no support within New Mexico case law.[19] Nor is the claim saved by

---

[19]Elliott relies on *Rogers*, 29 P.3d 887, for support of its argument. *Rogers* is inapposite for two distinct reasons. First, the *Rogers* court reached the implied-
(continued...)

Elliott's assertion that the 39% fee is a production cost that must be borne by Appellees because there is no market for the unprocessed gas at the wellhead. This duty imagined by Elliott is inconsistent with New Mexico law because the express terms of the royalty obligations direct the royalty to be paid on the value of the gas "at the well." *See Cont'l Potash, Inc.*, 858 P.2d at 80 (no implied covenants when subject matter addressed in contract); *Creson*, 10 P.3d at 856, 859 (marketability goes to issue of compliance with royalty obligations).

Elliott, therefore, has failed to present any analysis demonstrating that the implication of an unexpressed duty to market is necessary or appropriate. Thus, the district court correctly concluded that no genuine issue of material fact exists with respect to Elliott's claim of a breach of an implied duty to market.

*ii. Implied Covenant of Good Faith and Fair Dealing*

In *Continental Potash*, the New Mexico Supreme Court said:

> Whether express or not, every contract in New Mexico imposes the duty of good faith and fair dealing upon the parties in the performance and enforcement of the contract. The breach of this covenant requires a showing of bad faith or that one party wrongfully

---

[19](...continued)
duty-to-market issue by first concluding that the "at the well" leases were silent as to the allocation of post-production costs. *Rogers*, 29 P.3d at 896. As noted above, Elliott has specifically disclaimed any contract claim and has not placed the royalty documents in the record. Second, reliance on *Rogers*, which involved Colorado law, for this proposition would create tension with *Creson*. *See Creson*, 10 P.3d at 859 (royalty based on "net proceeds" at the well allows for deduction of "post-production, value-enhancing costs").

and intentionally used the contract to the detriment of the other party. 858 P.2d at 82 (citation omitted). Elliott's good faith and fair dealing claim, however, suffers from much the same problem as the implied duty to market claim. "[T]he implied covenant of good faith and fair dealing depends upon the existence of an underlying contractual relationship . . . ." *Azar v. Prudential Ins. Co. of Am.*, 68 P.3d 909, 925 (N.M. Ct. App. 2003). Despite its assertion to the contrary, Elliott cannot decouple its claim for breach of the implied covenant of good faith and fair dealing from the contract because the contractual relationship is the only relationship that exists between the parties. *See id.* at 927 ("The implied covenant of good faith and fair dealing . . . requires the existence of an underlying contract and may not be used to override the express provisions of an integrated, written contract.")

The manner in which Elliott has framed this issue makes it impossible to discuss, let alone determine, what the possible parameters of an implied covenant of good faith and fair dealing would involve.

> Generally, in the absence of an express provision on the subject, a contract contains an implied covenant of good faith and fair dealing between the parties. Under the implied covenant of good faith and fair dealing, courts can award damages against a party to a contract whose actions undercut another party's rights or benefits under the contract. Our Supreme Court has nevertheless refused to apply this implied covenant to override an express at-will termination provision in an integrated, written contract.

*Kropinak v. ARA Health Servs., Inc.*, 33 P.3d 679, 681 (N.M. Ct. App. 2001) (citations omitted). While Elliott asserts that Appellees' conduct is not governed by the contracts between the parties and that the contracts are silent as to the conduct at issue, it provides no contractual analysis suggesting that the implication of an unexpressed covenant of good faith and fair dealing is necessary to effectuate the express provisions for the payment of royalties.[20] *See, e.g.*, *Allsup's Convenience Stores, Inc.*, 976 P. 2d at 14 ("The concept of the implied covenant of good faith and fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement." (quotation omitted)); *Gilmore v. Duderstadt*, 961 P.2d 175, 182 (N.M. Ct. App. 1998) ("Whether there has been a breach of the covenant of good faith and fair dealing is a factual inquiry that focuses on the contract and what the parties agreed to." (citations omitted)); *Bourgeous v. Horizon Healthcare Corp.*, 872 P.2d 852, 856 (N.M. 1994) ("This concept of the duty of good faith initially developed in contract law as a kind of 'safety valve' to which judges may turn to fill gaps and qualify or limit rights and duties otherwise arising under rules of law and specific

---

[20]A breach of an implied covenant of good faith and fair dealing can also sound in tort, but Elliott does not claim the existence of a fiduciary relationship (such as that which exists between an insurer and an insured) and supplies no alternative source for the duties that Appellees allegedly breached. *See Bourgeous v. Horizon Healthcare Corp.*, 872 P.2d 852, 857 (N.M. 1994). Thus any such tort claim also fails.

contract language." (quotations omitted)). The district court, therefore, did not err in dismissing Elliott's claim of breach of an implied covenant of good faith and fair dealing.

### c. Tort Claims

The district court granted summary judgment in favor of Appellees on all of Elliott's tort claims. Dist. Ct. Order No. 3 at 2. The court concluded that Elliott's constructive fraud claim failed because the contractual relationship between the parties does not impose the requisite duty to disclose. The court rejected the fraud claim because there was no duty to disclose and, to the extent the claim rested on allegations of misrepresentations, Elliott failed to show detrimental reliance. Finally, the court granted summary judgment on Elliott's conversion claim because "[t]here are no facts on which the Court could conclude that [Appellees] unlawfully exercised dominion and control over [Elliott's] royalty rights" or that "[Appellees'] acts constituted an unauthorized and injurious use of Elliott's property." In addition to rejecting each individual tort claim, the district court, relying on *Isler v. Texas Oil and Gas Corp.*, 749 F.2d 22 (10th Cir. 1984), agreed with Appellees that Elliott's assertion that Appellees failed to pay royalty can be a breach of no duty other than one created by contract. This, the court concluded, provided an additional basis for dismissal of the claims of constructive fraud, fraud, and conversion.

On appeal Elliott argues that the district court misapplied New Mexico law when it suggested tort claims are barred simply because the parties have a contractual relationship. Elliott further asserts that its fraud claims are viable because it has established that Appellees were under a duty to disclose the 39% charge and with regard to Appellees' alleged misrepresentations, Elliott contends it has shown the requisite detrimental reliance.[21] Appellees counter that the district court properly concluded that *Isler* compelled dismissal of Elliott's tort claims. In addition, Appellees argue that they had no duty to disclose information concerning the 39% processing deduction, thus Elliott cannot pursue claims for constructive fraud and fraud. Finally, Appellees argue that the court correctly concluded that there was no evidence of Elliott's reliance on Appellees' alleged misrepresentations.

In *Isler v. Texas Oil and Gas Corp.*, plaintiffs sought to maintain a negligence action against defendant for failure to make rental payments despite a provision in the contract that limited liability for failure to make such payments. 749 F.2d at 22. This court reversed a judgment in favor of plaintiffs on their tort claim because "the facts alleged in plaintiffs' tort claim are precisely the same as

---

[21]In its opening brief Elliott makes no argument regarding its conversion claim beyond contending that the district court erred when it concluded *Isler* was a basis to dismiss all the tort claims. Failure to raise an issue in an opening appellate brief waives the issue. *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994).

-44-

those alleged in their contract claim." 749 F.2d at 24. Relying on New Mexico case law, we reasoned that when a "contract specifically define[s] the rights and duties of the parties" any claimed breach of an "extracontractual tort duty" is precluded. *Id.* This is because parties should "be bound by the terms of written agreements to which they freely commit themselves." *Rio Grande Jewelers Supply, Inc. v. Data General Corp.*, 689 P.2d 1269, 1271 (N.M. 1984). The rule in New Mexico is that "the concept of freedom of contract and notions of contractually assumed duties and liabilities can act to limit general tort liability in certain circumstances when limited liability is expressly bargained for." *State ex rel. Udall v. Colonial Penn Ins. Co.*, 812 P.2d 777, 785 (N.M. 1991).

*Isler* and corresponding New Mexico case law stand for the proposition that the existence of any tort liability cannot conflict with any contractual duties between the parties. *See Hess Oil Virgin Islands Corp. v. UOP, Inc.*, 861 F.2d 1197, 1200 (10th Cir. 1988) (noting that *Isler* holds "no tort duty can be imposed on a party where that party's same duties and rights are specifically defined by contract"). While the relationship between the parties in the instant case is rooted in contract, Elliott has failed to provide this court with any analysis of its tort claims in the context of the express contracts obligating Appellees to pay royalties. As a consequence, this court can only speculate as to the interrelationships of Appellees' express contractual duties and the purported duties alleged to have

-45-

been breached in Elliott's tort claims. Elliott's unsupported conclusory allegations regarding the nature of Appellees' obligations untethered to any discussion of the contractual duties governing the parties' relationship do not create a genuine issue of material fact. The district court's grant of summary judgment is therefore affirmed.

*d. Unjust Enrichment*

The district court relied on *Ontiveros Insulation Co. v. Sanchez*, 3 P.3d 695 (N.M. Ct. App. 2000), in granting Appellees' motion for summary judgment on Elliott's unjust enrichment claim. The court concluded under *Ontiveros* that because the claim arises in equity it cannot exist where, as here, the parties are in privity of contract. On appeal Elliott argues that the court misread *Ontiveros* to automatically bar unjust enrichment claims where a contractual relationship between the parties exists. Moreover, Elliott suggests that even if *Ontiveros* does bar claims where a contractual provision governs, it does not prevent Elliott from bringing its unjust enrichment claim because there is no express contractual provision related to the 39% processing fee at issue. Appellees respond that the district court properly read and applied *Ontiveros* and Elliott's argument that its unjust enrichment claims should stand because there is no express contractual provision related to the 39% fee is untenable.

In *Ontiveros*, the New Mexico Court of Appeals said that "equity does not take the place of remedies at law, it augments them; in this regard, an action in contract would be preferred to one in quasi-contract." 3 P.3d at 699. Consistent with the district court's interpretation of *Ontiveros* to mean that the presence of a contract bars a claim for unjust enrichment,

> the hornbook rule [is] that quasi-contractual remedies . . . are not to be created when an enforceable express contract regulates the relations of the parties with respect to the disputed issue. Courts have recognized this principle and have stated their unwillingness to resort to the doctrine of unjust enrichment to override a contractual [] provision.

*Member Services Life Ins. Co. v. Am. Nat'l Bank & Trust Co. of Sapula*, 130 F.3d 950, 957 (10th Cir. 1997) (citations omitted) (involved ERISA case). *See also* 26 Richard A. Lord, *Williston on Contracts* § 68:5 (4th ed. 2004) ("Where the plaintiff has no alternative right on an enforceable contract, the basis of the plaintiff's recovery is the unjust enrichment of the defendant."). Elliott's unjust enrichment claim fails, like Elliott's other extracontractual claims addressed above, because the claim for underpayment of royalties is grounded in the parties' contractual relationship. Elliott asserts that "there is *no* express contractual claim based on the 39% in-kind processing fee deductions because the parties have no such contract" and thus they should be permitted to bring a claim for unjust

enrichment.[22]  Elliott mistakes form for function.  The contracts may not delineate any specific deductions, yet the contracts control how royalties are to be paid.  Indisputably, there are contracts between the parties, thus any claim for underpayment of royalties, including a claim for unjust enrichment, must begin with those contracts.  The district court's grant of summary judgment to Appellees on Elliott's unjust enrichment claim is therefore affirmed.

*e. New Mexico Unfair Practices Act*

Appellees moved for partial summary judgment on Elliott's statutory claims, including Elliott's claim under the New Mexico Unfair Practices Act, which the district court originally denied.  Later, Appellees again moved for partial summary judgment on Elliott's punitive damages and UPA claim.  The district court vacated the previous order denying Appellees' summary judgment motion and granted Appellees' motion, dismissing Count 1 of the Second Amended Complaint.  The

---

[22]The case law Elliott cites to support this argument is unavailing.  As Appellees correctly note, Elliott mischaracterizes *Central Security and Alarm Co. v. Mehler*, 918 P.2d 1340 (N.M. Ct. App. 1996), because that case involved the proper measure of damages.  Elliott also cites *Klein v. Arkoma Production Co.*, 73 F.3d 779, 786 (8th Cir. 1996), to support its argument that because there is no express clause in the lease agreements relating to the 39% processing charge Elliott should be permitted to bring a claim for unjust enrichment.  Although the case involved royalty interest owners, *Klein* recognized that "[n]ormally when an express contract exists between the parties, unjust enrichment is not available as a means of recovery." *Id.*  The Eighth Circuit concluded in that case that the leases at issue did not address whether a third party transaction fits within the definition of "market value of gas." *Id.*  Additionally, the primary defendants were *not* parties to the leases. *Id.*  These are not the facts of the present case.

district court concluded that Elliott, as a royalty owner, is neither a purchaser nor seller of royalty gas, nor does the case involve the sale, lease, rental, or loan of goods and services as required by the UPA.

On appeal Elliott argues that the district court erred by ignoring that Elliott is an involuntary purchaser of processing services under the UPA. Elliott argues that Appellees violated the UPA by charging Elliott inflated rates for processing services and misrepresenting the amount (39% in-kind fee) charged for such services. The State of New Mexico, as amicus curiae, supports Elliott's argument, asserting that Appellees' conduct falls within the ambit of the UPA. The State argues that Appellees' retention of 39% of the NGLs is "in connection with" the processing services at the Plant. Appellees counter that real estate interests, including oil and gas leases, are not "goods or services" under the UPA, and, under New Mexico law, royalty instruments do not result in purchases or sales of either oil and gas or post-production services.

The UPA provides that "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful." N.M. Stat. Ann. § 57-12-3. Trade or commerce includes "the advertising, offering for sale or distribution of any services and any property and any other article, commodity or thing of value, including any trade or commerce

directly or indirectly affecting the people of this state." *Id.* at § 57-12-2(C). An

unfair or deceptive trade practice

> means an act specifically declared unlawful pursuant to the Unfair
> Practices Act . . ., a false or misleading oral or written statement,
> visual description or other representation of any kind knowingly
> made in connection with the sale, lease, rental or loan of goods or
> services or in the extension of credit or in the collection of debts by a
> person in the regular course of his trade or commerce, which may,
> tends to or does deceive or mislead any person . . . .[23]

*Id.* at § 57-12-2(D). An unconscionable trade practice is similarly defined as

> an act or practice in connection with the sale, lease, rental or loan, or
> in connection with the offering for sale, lease, rental or loan, of any
> goods or services, including services provided by licensed
> professionals, or in the extension of credit or in the collection of
> debts which to a person's detriment:
>
> > (1) takes advantage of the lack of knowledge, ability,
> > experience or capacity of a person to a grossly unfair
> > degree; or
> >
> > (2) results in a gross disparity between the value
> > received by a person and the price paid.

*Id.* at § 57-12-2(E). "Because the Unfair Practices Act constitutes remedial

legislation, [courts] interpret the provisions of this Act liberally to facilitate and

accomplish its purposes and intent." *State ex rel. Stratton v. Gurley Motor Co.*,

737 P.2d 1180, 1185 (N.M. Ct. App. 1987).

---

[23]The UPA defines "person" to include "natural persons, corporations, trusts, partnerships, associations, cooperative associations, clubs, companies, firms, joint ventures or syndicates." N.M. Stat. Ann. § 57-12-2(A).

This circuit recently recognized that the UPA "'does not apply to sales of real estate.'" *Kysar v. Amoco Prod. Co.*, 379 F.3d 1150, 1157 (10th Cir. 2004) (quoting *McElhannon v. Ford*, 73 P.3d 827, 832 (N.M. Ct. App. 2003)). *Kysar* held that misrepresentations in connection with a mineral lease regarding rights of access were unconnected to a good or service and therefore did not constitute a violation of the UPA. *Id.* In concluding that a completed house is a form of realty and therefore cannot be goods or services under the UPA, the *McElhannon* court said, "[t]he word goods is generally understood to mean personal estate as distinguished from realty," and "[t]he word services is generally understood to mean work done by one person at the request of another." 73 P.3d at 832 (quotations, citations, and alterations omitted). The court further reasoned that "[t]o the extent goods and services are combined to create a structure that is permanently affixed to realty, they are understood to have been 'converted' to realty." *Id.*

Elliott is a royalty interest owner alleging, at the core of its case, underpayment of royalties.

> The term royalty or royalty interest, as used in oil and gas parlance to define a mineral interest in land, has a well known and commonly accepted meaning. It means a share (usually 1/8th) in the oil and gas reserved to the landowner from an oil and gas lease, which when produced is delivered to the purchaser free of cost to the landowner.

*Shinn v. Buxton*, 154 F.2d 629, 632 (10th Cir. 1946).  In New Mexico "a grant or reservation of the underlying oil and gas, or royalty rights provided for in a mineral lease as commonly used in this state, is a grant or reservation of real property."  *Duvall v. State*, 213 P.2d 212, 215 (N.M. 1949).  "[I]t matters not whether the production from a mineral well is claimed or whether a portion of the fund resulting from the sale of the production is claimed; in New Mexico, both assets are realty."  *Fullerton v. Kaune*, 382 P.2d 529, 533 (N.M. 1963).  Because the payment of royalties, including any associated deductions for post-production costs, is not connected to goods or services but to realty, Elliott's claim does not fall within the ambit of the UPA.  The district court's grant of summary judgment is therefore affirmed.

*f. New Mexico Oil and Gas Proceeds Payment Act*

The relevant language of the New Mexico Oil and Gas Proceeds Payment Act reads:

> The oil and gas proceeds derived from the sale of production from any well producing oil, gas or related hydrocarbons in New Mexico shall be paid to all persons legally entitled to such payments, commencing not later than six months after the first day of the month following the date of first sale and thereafter not later than forty-five days after the end of the calendar month within which payment is received by payor for production unless other periods or arrangements are provided for in a valid contract with the person entitled to such proceeds.

N.M. State. Ann. § 70-10-3 (2004).

*i. Meaning of Legal Entitlement*

In the Second Amended Complaint, Elliott asserted that Appellees' underpayment of royalties is a failure to make full payments to Elliott for their pro rata share of proceeds from the sale of NGLs within the requisite forty-five day period. As such, Elliott seeks payment of all unpaid amounts and interest calculated at the rate of eighteen percent per year on the unpaid balance. The district court granted summary judgment to Appellees on Elliott's Payment Act claim because the court concluded the claim necessarily failed once the court rejected all of Elliott's other theories of potential liability.

On appeal, Elliott argues that in addition to the numerous theories supporting Appellees' liability for underpayment of royalties, Elliott can proceed independently under the Payment Act. The State of New Mexico, as amicus curiae, supports Elliott's argument, declaring that by requiring Elliott to "have an independent contract or tort claim in order to proceed under the Payment Act, the District Court has fabricated a limitation upon the availability of the Payment Act to injured payees which the Legislature clearly did not intend, and has emasculated the remedial nature of the Payment Act."

Elliott cites to no legal authority for its position that the Payment Act supplies an independent statutory basis for relief. *Cf. Phillips v. Calhoun*, 956 F.2d 949, 954 (10th Cir. 1992) (holding that failure to develop a legal argument

supporting a claim results in waiver of the claim). Although the State provides a more extensive legal argument for its position, its entire argument rests on the assumption that Elliott has in fact been underpaid by Appellees. A claim for underpayment of royalties may very well fall within the provisions of the Payment Act. Elliott and the State misread the district court's order to suggest otherwise. The district court did not hold that Elliott must assert a certain type of claim–contract or tort, for example–in order to bring a claim under the Payment Act. Instead, based on the plain language of the statute, the district court properly concluded that in order to maintain a Payment Act claim, Elliott must allege a potentially successful claim for underpayment of royalties or theory of liability showing that it is "legally entitled to such payments," N.M. State. Ann. § 70-10-3 (2004), independent of any claim under the Act itself.[24] Because we agree with the district court that Elliott has failed to demonstrate any potentially successful theory of liability, Elliott's claim under the Payment Act fails and the district court's grant of summary judgment is affirmed.

### ii. BP's "Same as Fed" Lease Obligations

Elliott also argues that because BP admitted it had underpaid its "same as fed" overriding royalty owners, summary judgment should have been granted in

---

[24]At oral argument, Elliott specifically rejected the suggestion that its Payment Act claim is grounded on the contractual royalty obligations.

favor of Elliott on its Payment Act claim against BP. Appellees respond that the question of BP's liability under its "same as fed" leases was not an issue in this case. Appellees contend that only ConocoPhillips' "same as fed" leases are at issue because only ConocoPhillips asserted a counterclaim and thereafter moved for summary judgment on its compliance with those leases. Even if BP's "same as fed" leases were at issue, Appellees argue that Elliott's Payment Act claim lacks merit because Elliott affirmatively prevented BP from correcting the payment error.

The district court granted summary judgment to ConocoPhillips on its "same as fed" royalty obligations without any reference to BP's "same as fed" leases. Dist. Ct. Order No. 1 at 10. In a subsequent order, the district court, without any reference to BP's "same as fed" leases, rejected Elliott's Payment Act claim because no theories of potential liability remained.[25] Dist. Ct. Order No. 4. Elliott had moved for summary judgment against BP under the Payment Act because of alleged underpayment of royalties on BP's "same as fed" leases. Elliott filed its motion for summary judgment after members of the class received a letter from BP

---

[25]The district court vacated the previous memorandum opinion and order in which the court had denied Appellees' motion for summary judgment on Elliott's statutory claims (including the Payment Act claim) and thereafter granted Appellees' earlier motion.

admitting underpayment.[26]  Appellees are correct, however, that BP's "same as fed" leases were never a part of Elliott's case.[27]

Generally, failure to set forth in the complaint a theory upon which the plaintiff could recover does not bar a plaintiff from pursuing a claim.  *Green Country Food Market, Inc. v. Bottling Group, LLC*, 371 F.3d 1275, 1279 (10th Cir.

---

[26]The letter dated April 19, 2002 was addressed to overriding royalty interest owner[s].  It stated:

> BP America Production Company has determined that, in certain New Mexico San Juan Basin properties, your overriding royalty value should be calculated on the same basis as Federal royalty.  This means your overriding royalty calculation should be based on the same allowance rates for processing and transportation costs as Federal royalty rather than certain contract based rates.  The current valuation method will change effective with February 2002 production.
>
> We are in the process of determining any additional overriding royalty amount you may be entitled to for the past periods due to this difference in valuation. . . .

[27]In BP's response to Elliott's motion for summary judgment as to liability on the Payment Act claim, it argued that "the Class has never asserted a breach of contract claim, but has *consistently denied* that the contractual instruments (creating the royalty interests and containing express language governing Defendants' royalty payment of obligations) are even at issue in this case."  BP went on to argue that in this motion "the Class claims, *for the first time in this lawsuit*, that [BP's] voluntary decision to make a prior-period adjustment to royalties previously paid to royalty owners entitled to be paid under the same as fed methodology somehow violates the Act.  Obviously, under Rule 56(a) a party cannot move for summary judgment on a nonexistent, non-pleaded claim."  Moreover, BP noted that "[i]t never occurred to the Class to make the same as fed payments an issue in this case until after [BP] voluntarily stepped forward to fulfill the same as fed royalty payment obligations required by the leases."

2004). "The liberalized pleading rules, however, do not permit plaintiffs to wait until the last minute to ascertain and refine the theories on which they intend to build their case." *Id.* This is particularly true if permitting a plaintiff to change its theory will prejudice the other party in maintaining its defense. *Id.* In this instance Elliott, in its summary judgment motion, attempted to assert an entirely new factual basis for relief which had not heretofore been a part of the case.[28] The thrust of Elliott's entire case had been Appellees' underpayment of royalties based on the 39% in-kind deduction charged to "at the well" royalty owners. The letter sent by BP indicates that it was erroneously treating some overriding royalty interest owners under the "at the well" methodology as opposed to the "same as fed" methodology. Elliott had never asserted in its complaint that this was a basis for liability and to permit Elliott to make this claim at such a late stage in the proceedings would risk prejudicing BP.

---

[28]ConocoPhillips did file counterclaims seeking a declaratory judgment that it complied with its "same as fed" contractual obligations and moved for summary judgment on its compliance with its "same as fed" obligations. BP specifically declined to join in ConocoPhillips' summary judgment motion "because it d[id] not believe that these 'same as fed' instruments [we]re at issue in this case." BP argued that one of the reasons the "same as fed" issues were not part of the case is because the federal processing allowance, to which "same as fed" royalty interest owners' royalties are subject, is lower than the 39% processing deduction that BP applies in other contracts. Although the district court did recognize that BP's letter to class members involved the calculation of royalty payments which is "related to this lawsuit," this was presumably heavily influenced by considerations of preventing confusion among unnamed class members.

The district court properly rejected Elliott's Payment Act claim because it concluded no potentially successful theory of liability remained. One of the theories of potential liability was BP's alleged underpayment of royalties on its "same as fed" leases. This was not, however, a theory that was ever raised by Elliott prior to its summary judgment motion. The district court thus appropriately denied Elliott's motion for summary judgment on the Payment Act claim.

g. *ConocoPhillips' "Same as Fed" Lease Obligations*

The district court granted ConocoPhillips' motion for summary judgment on its contractual duty under its "same as fed" royalty obligations concluding that Elliott failed to rebut the evidence submitted by ConocoPhillips. ConocoPhillips relied upon the testimony of Danny Frizzell and Curtis Bradley to support its position that ConocoPhillips has paid royalties to its "same as fed" royalty owners, including Elliott, in accordance with its contractual obligations. Elliott responded with an affidavit from Stephen Elliott. On appeal Elliot argues without any citations to the record that it successfully raised genuine questions of material fact and that the district court erred in deciding those disputed facts in favor of ConocoPhillips. "Without a specific reference, we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury." *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) (quotation omitted).

We agree with the district court's rejection of the Elliott affidavit based on its conclusory statements. *See, e.g.*, *Matthiesen v. Banc One Mortgage Corp.*, 173 F.3d 1242, 1247 (10th Cir. 1999) (rejecting testimony of an expert as conclusory for summary judgment). As the district court noted, "[Stephen] Elliott does not identify the properties to which he refers, making it impossible for [ConocoPhillips] or for this Court to address or evaluate his assertions." Because Elliott came forward with no other evidence to rebut ConocoPhillips' motion, the district court's grant of summary judgment in favor of ConocoPhillips is affirmed. *See United States v. Simons*, 129 F.3d 1386, 1388 (10th Cir. 1997) ("Where a movant has met the initial burden required to support summary judgment, the non-movant then must either establish the existence of a triable issue of fact under Fed.R.Civ.P. 56(e) or explain why he cannot . . . under Rule 56(f)." (quotation omitted)).

*h. Antitrust Claims*

In its Second Amended Complaint Elliott alleged that Appellees' conduct is a *per se* violation of Sections 1 and 2 of the Sherman Antitrust Act, or, in the alternative, an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act. Elliott seeks to recover treble damages plus attorneys' fees and costs of litigation pursuant to 15 U.S.C. § 15. In addition, Elliott seeks a

permanent injunction to stop Appellees from engaging in the alleged illegal acts, as provided by Section 16 of the Clayton Act, 15 U.S.C. § 26.

More specifically, Elliott claims that BP and ConocoPhillips have combined and conspired to illegally fix the price charged for processing gas extracted from the San Juan Basin by charging a 39% processing fee. By charging this "exorbitant" 39% processing fee, Elliott alleges Appellees have contracted, combined and conspired to illegally depress the wellhead price. Additionally, Elliott alleges that Appellees have entered into an illegal tying arrangement whereby gas in which Elliott owns an interest must be processed at the Plant as a condition of entry to the interstate market. The effect of this tying arrangement, Elliott asserts, is to fix prices and depress values paid to Elliott. Not only does Elliott argue that Appellees have fixed the price of royalties paid to Elliott, but further alleges that Appellees' conduct suppresses interstate competition among sellers, purchasers, or users of gas and NGLs.

Appellees moved to dismiss Elliott's antitrust claim for failure to state a claim because Elliott's injury, if any, does not constitute an "antitrust injury" and Elliott does not have standing to pursue an antitrust claim. Appellees further alleged that Elliott added the antitrust claim only to provide a new basis for federal jurisdiction under 28 U.S.C. § 1331.

The district court granted Appellees' motion to dismiss. The court concluded that because Elliott failed to show "that they have been damaged by an anticompetitive effect of defendants' actions," Elliott has not demonstrated an antitrust injury or that it has standing to bring an antitrust claim.

On appeal Elliott argues that the district court erred in concluding it did not suffer an antitrust injury and did not have standing to bring its antitrust claims. Elliott argues that it is a captive consumer in the market for gas processing services and Appellees, in violation of Section 1 of the Sherman Act, formed a cartel to horizontally fix prices for gas processing services at anticompetitive levels and injured the class. Secondly, in violation of Section 2, Elliott claims that it was injured as a supplier of raw natural gas with entrained NGLs because only one purchaser, Appellees, exercised monopolistic power to use their excessive gas processing to drive down the amount the class receives as payment for the natural gas and NGLs supplied to the marketplace.

The legal sufficiency of a complaint is a question of law; therefore, a Rule 12(b)(6) dismissal is reviewed *de novo*. *Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).

> [A]ll well-pleaded factual allegations in the . . . complaint are accepted as true and viewed in the light most favorable to the nonmoving party. A 12(b)(6) motion should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Id.* (quotations and citation omitted). Under this standard of review, we affirm the district court's dismissal of Elliott's antitrust claims.

Section 1 of the Sherman Act declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade of commerce among the several States, or with foreign nations."[29] 15 U.S.C. § 1. Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce . . . shall be deemed guilty of a felony . . . ."[30] 15 U.S.C. § 2.

---

[29]Under Section 1 agreements "may be illegal if (1) their purpose or effect is to create an *unreasonable* restraint of trade, or (2) they constitute a per se violation of the statute." *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1359-60 (10th Cir. 1989). To make out a claim of horizontal price-fixing, Elliott must allege "(1) the existence of an agreement, combination or conspiracy, (2) among actual competitors (i.e., at the same level of distribution), (3) with the purpose or effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity (4) in interstate or foreign commerce." *Id.* at 1361 (quotation omitted). To show an illegal tying arrangement whereby one party agrees to sell one product, the tying product, only on condition that the buyer also purchase a second product, the tied product, the buyer must demonstrate that the seller has appreciable economic power in the tying product market and the arrangement affects a substantial volume of commerce in the tied product market. *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publ'ns, Inc.*, 63 F.3d 1540, 1546 (10th Cir. 1995).

[30]"Conduct violates this section where an entity acquires or maintains monopoly power in such a way as to preclude other entities from engaging in fair competition." *TV Communications Network v. Turner Network Television, Inc.*,

(continued...)

Under Section 4 of the Clayton Act, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . , and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). Despite the broad language of Section 4, a private plaintiff must have suffered an antitrust injury and must have standing to bring an antitrust claim. *Atlantic Richfield Co. v. USA Petroleum, Co.*, 495 U.S. 328, 344 (1990); *see also Sharp v. United Airlines, Inc.*, 967 F.2d 404, 406 (10th Cir. 1992). Antitrust injury and antitrust standing are overlapping concepts; "[s]tanding cannot be established without an antitrust injury, but the existence of an antitrust injury does not automatically confer standing." *Sharp*, 967 F.2d at 406 (quotation omitted).[31]

---

[30](...continued)
964 F.2d 1022, 1024-25 (10th Cir. 1992) In a Section 2 monopoly claim a plaintiff must show: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* at 1025 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).

[31]Demonstrating an antitrust injury is an element of antitrust standing. This court has held that, under Supreme Court precedent, courts should consider numerous factors in evaluating antitrust standing including:

(1) the causal connection between the antitrust violation and the plaintiff's injury; (2) the defendant's intent or motivation; (3) the nature of the plaintiff's injury–i.e. whether it is one intended to be redressed by the antitrust laws; (4) the directness or the indirectness

(continued...)

"An antitrust injury is an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful." *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951, 962 n.15 (10th Cir. 1990) (quotation omitted). The Sherman Act was designed to protect market participants from anticompetitve behavior in the marketplace. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 530 (1983). Thus, "[t]he antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atlantic Richfield Co.*, 495 U.S. at 344.

The injury alleged by Elliott is the underpayment of royalties. The alleged underpayment is a result of the 39% fee charged by Appellees to process gas. Any injury that Elliott has suffered from this fee is not an antitrust injury because it has no adverse effect on competition or consumers. *Id.* at 337. Indeed, Elliott appears to recognize the problem with its antitrust claim and tries to implicate competition/consumers by casting itself in the role of either a "consumer" or a "supplier." Elliott, however, is neither a consumer of Appellees' products, nor a

[31](...continued)
of the connection between the plaintiff's injury and the market restraint resulting from the alleged antitrust violation; (5) the speculative nature of the damages sought; and (6) the risk of duplicative recoveries or complex damages apportionment.

*Sharp v. United Airlines*, 967 F.2d 404, 406-07 (10th Cir. 1992).

competitor of Appellees in producing gas and Elliott makes no allegation of any harm other than the economic loss which Elliott itself allegedly suffered. Fundamentally, although Elliott tries to characterize itself as a consumer of gas processing services and also as a supplier of natural gas and NGLs, Elliott is a royalty interest owner in a lease to Appellees.

> Mere injury as a landlord or lessor entitled to royalties would not by itself be the kind of injury to competition that the antitrust laws are designed to prevent. The requirement that the alleged injury be related to anticompetitive behavior requires, as a corollary, that the injured party be a participant in the same market as the alleged malefactors.

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 148 (9th Cir. 1989) (en banc) (quotation omitted). Thus, Appellees' alleged conduct does not harm competition or consumers.

Even assuming that Appellees' conduct harmed competition, Elliott's injury is not a result of this alleged anticompetitive behavior. *See, e.g.*, *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1033 (9th Cir. 2001). An anticompetitive injury would exist if, for example, Elliott alleged that Appellees were conspiring with gas purchasers to keep downstream sales prices artificially low, such that Elliott's resulting royalty payments were reduced. *See, e.g.*, *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 223-24, 227 (1948) (concluding beet growers properly stated an antitrust claim by alleging sugar

refiners agreed to pay uniform prices for sugar beets). This is not Elliott's allegation. Nor is it Elliott's allegation that the effect of Appellees' charging the 39% fee is anticompetitive by in some way limiting Elliott's participation in the natural gas market. *See, e.g.*, *Telecor Communications, Inc. v. Southwestern Bell Tel. Co.*, 305 F.3d 1124, 1128-29 (10th Cir. 2002) (describing Southwestern Bell's actions making it more difficult for competitors to enter the Oklahoma pay phone market). Elliott's allegation is that Appellees are improperly calculating the royalty payment due Elliott–either by charging an unreasonable fee for a legitimate post-production cost or by charging a fee for an illegitimate post-production cost. Even assuming Appellees' conduct is anticompetitive, Elliott's claimed injury does not stem from the "competition-*reducing* aspect or effect of [Appellees'] behavior." *Atlantic Richfield Co.*, 495 U.S. at 344.

Because we conclude that Elliott has not alleged an antitrust injury, its antitrust claims necessarily fail. *Sharp*, 967 F.2d at 406. The district court thus properly dismissed Elliott's antitrust claims for failure to state a claim.

**D. Dichter's Appeal**

In addition to appealing the denial of their motion to intervene, which we have dismissed as moot, *see* discussion *supra* Part III.A, Dichter, not a party to the original proceeding, is attempting to appeal the final judgment entered in favor of

Appellees.[32] "The rule that only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment is well settled." *Marino v. Ortiz*, 484 U.S. 301, 304 (1998) (per curiam). In *Devlin v. Scardelletti*, the Supreme Court excepted from this general rule unnamed class members who have objected to a class settlement at the fairness hearing because "[t]o hold otherwise would deprive nonnamed class members of the power to preserve their own interests in a settlement that will ultimately bind them, despite their expressed objections before the trial court." 536 U.S. 1, 10 (2002); *see also In re Integra Realty Res., Inc.*, 354 F.3d 1246, 1256-58 (10th Cir. 2004) (discussing the import of *Devlin*). Dichter is not objecting to a class settlement but instead attempting to challenge subject matter jurisdiction. This court must address subject matter jurisdiction regardless of Dichter's appeal, thus the rationale behind the exception in *Devlin* does not apply. Moreover, because we have already granted Dichter's motion to intervene in Elliott's appeal and also determined that the district court erroneously relied on a theory of aggregation when it concluded subject matter jurisdiction existed over the putative class, Dichter's primary argument in support of their right to appeal is, as a practical matter, moot. The motion to dismiss those

_____

[32]Dichter's appeal of the denial of its motion to intervene and its appeal of the final judgment involve Case No. 04-2014.

portions of Dichter's appeal that do not relate to the district court's denial of Dichter's motion to intervene is therefore granted.

## IV. CONCLUSION

For the foregoing reasons, the district court's judgment is **AFFIRMED** with respect to Elliott's claims as an individual plaintiff. The claims of the class are **REMANDED** to the district court with instructions to vacate the judgment against the class, to decertify the class, and to dismiss the claims without prejudice. Dichter's motion to intervene on appeal in the first instance is **GRANTED** and Dichter's appeal is **DISMISSED**.